Filed 7/28/26  Marriage of Bennett and Gardner CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re the Marriage of ANDREA BENNETT and REID GARDNER. | B338792 |
| | (Los Angeles County Super. Ct. No. 19PSFL01940) |
| ANDREA BENNETT, Respondent, v. REID GARDNER, Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kenneth M. Fuller, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Procopio, Cory, Hargreaves & Savitch, Kendra J. Hall and Megan E. Dawson for Appellant.

Nelson Kirkman and Graham D. Kirkman for Respondent.

———————————————

Appellant Reid Gardner and respondent Andrea Bennett were married for approximately six and a half years. After trial in this marital dissolution action, the family court issued a judgment awarding spousal support to Bennett pursuant to the parties' stipulation, characterizing the parties' various assets as separate or community and valuing certain of those assets, ordering Gardner to reimburse Bennett for funds he used to post bail, and awarding Bennett $70,000 in attorney fees and costs under Family Code section 271. Pursuant to these rulings, the court ordered Gardner to pay approximately $130,000 to Bennett.

Although Gardner timely requested a statement of decision and raised objections to the tentative decision, the family court erred in failing to issue a statement of decision that adequately explained the factual and legal bases for many of its property characterizations. Accordingly, in reviewing those orders, we cannot deem the court to have impliedly made every factual finding necessary to support its rulings. For several of the property characterizations, we conclude the proper remedy is to remand to allow the court to issue an adequate statement of decision. We also order the court to reassess certain other property characterizations because we lack sufficient information to determine in the first instance whether, and, if so, to what extent, any of the intramarital earnings from Bennett's separate property freelance writing business should have been apportioned to the community property estate. Further, we affirm the court's valuation of Gardner's USAA Federal Saving Bank account. We also conclude the court's failure to issue an adequate statement of decision disclosing the legal and factual basis for its valuation of the community interest in one of Bennett's bank accounts was harmless.

2

Next, we conclude the family court did not err in finding Gardner engaged in conduct sanctionable under Family Code section 271. The court, however, erred in awarding Bennett $70,000 in attorney fees and costs in defending against Gardner's ultimately unsuccessful civil action because her civil counsel billed her only $54,108.37. We also order the court to determine whether Bennett used community funds to pay those attorney fees and costs, and, if she did, the court should adjust the equalization payment accordingly.

Lastly, we reject Gardner's contention that he did not owe Bennett any spousal support under the support stipulation because he failed to earn a gross income of at least $190,000 in any calendar year. The stipulation obligated Gardner to pay spousal support to Bennett twice a month so long as Gardner retained his law license and met the annual gross income requirement. Under Gardner's interpretation of the stipulation, he would not be required to make any support payments unless and until enough time had elapsed for him to have earned $190,000 or more in a calendar year, at which point he would apparently owe support arrears for the months in which he earned that level of income. Gardner's construction of the stipulation would thus undermine the objective of maintaining the supported spouse's standard of living. Accordingly, we conclude Gardner has not shown the family court erred in awarding Bennett spousal support arrears for the months in which Gardner's anticipated annual gross income was at least $190,000.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

We summarize only those facts pertinent to our disposition of this appeal.  We describe additional facts relevant to our analysis in our Discussion, *post*.

Bennett and Gardner were married on February 9, 2013.  The couple separated on August 31, 2019; they were thus married for approximately six years and six months.

Gardner claims that during the marriage, he used his separate property to purchase a canine named Astro.  According to Gardner, when Bennett "abruptly left the family home in San Diego" in September 2019, "she took Astro with her without [Gardner's] consent."  Gardner was later arrested and charged with burglary for entering Bennett's residence in the middle of the night to retrieve Astro.[2]

On October 9, 2019, Bennett filed a petition for legal separation.[3]  On January 8, 2020, the parties executed and filed two stipulations:  (1) a stipulation containing proposed orders requiring Gardner to pay spousal support to Bennett, provided

---

[1] We derive our Factual and Procedural Background in part from undisputed aspects of the family court's rulings, admissions made by the parties in their appellate briefing, and Bennett's assertions in her appellate brief that Gardner does not contest in his reply.  (See *Association for Los Angeles Deputy Sheriffs v. County of Los Angeles* (2023) 94 Cal.App.5th 764, 772, fn. 2, 773–774 (*Association for Los Angeles Deputy Sheriffs*) [employing this approach].)

[2] Neither party reveals the final disposition of the criminal matter against Gardner.

[3] On February 27, 2020, Bennett filed an amended petition seeking dissolution of the marriage.

certain conditions were met (support stipulation); and (2) a stipulation concerning Astro (Astro stipulation). Both stipulations were signed by the family court and issued as court orders. The Astro stipulation provided: (1) Gardner purchased Astro with separate property funds; (2) although Bennett claimed to "believe[ ] . . . [she] was within her rights to take Astro," the parties "agreed . . . Astro is the separate property of" Gardner; and (3) "because Astro has also become an emotional support dog for [Bennett's] minor daughter from a prior relationship, the parties stipulate[d], and the [c]ourt d[id t]hereby find and [o]rder that Astro . . . be awarded to [Bennett]."

Gardner maintains that after the parties executed the Astro stipulation, (1) Bennett told the police she did not admit that Astro belonged to Gardner at the time he entered Bennett's residence to retrieve the canine, and (2) Bennett testified at the preliminary hearing in the criminal case that Astro had been acquired as a family pet for her daughter.

In December 2021, Gardner moved in the family court to set aside the support and Astro stipulations on the grounds of perjury, fraud, and duress.

On February 18, 2022, Gardner filed a civil complaint against Bennett. Gardner alleged causes of action for intentional infliction of emotional distress, intentional interference with a prospective economic advantage, tortious interference with contractual relations, breach of fiduciary duty, and extortion.

On April 29, 2022, the family court found Gardner's allegations of perjury and fraud in his motion to set aside the support and Astro stipulations were untimely, but allowed Gardner to pursue his claim of duress at trial.

5

On November 18, 2022, the civil court sustained Bennett's demurrer to Gardner's complaint without leave to amend for lack of jurisdiction. Gardner later reasserted in this family law case the same five causes of action he had raised in the civil action.

The family court conducted a trial in this matter on January 17, 2024 and March 4 to 8, 2024.[4]

On June 3, 2024, the family court issued a judgment that, inter alia, (1) awarded Bennett $26,582.83 pursuant to the support stipulation; (2) ruled Gardner did not meet his burden of proof as to the five civil causes of action he reasserted in this family law action; (3) denied Gardner's motion to set aside the support and Astro stipulations because he failed to meet his burden of proving duress; (4) awarded certain assets to Bennett and Gardner as their respective separate property; (5) determined certain assets belonged to the community and the community had an interest in certain separate property assets; (6) awarded jewelry to the party currently in possession of the jewelry without offset or equalization; (7) ordered Gardner to reimburse Bennett $25,000 because the court found he used community funds to post bail; and (8) ordered Gardner to pay Bennett $70,000 in attorney fees and costs as a sanction pursuant to Family Code section 271. The net effect of the court's rulings was an order requiring Gardner to make an equalization payment to Bennett of $134,491.43, with interest accruing at the legal rate of 10 percent per year starting on June 1, 2024.

On May 10, 2024, Gardner filed a premature notice of appeal from the judgment. On August 1, 2024, Gardner filed

---

[4] We describe the procedural history relating to Gardner's request for a statement of decision in Discussion, part A.2, *post*.

6

another notice of appeal from the judgment.  On August 16, 2024, this court granted Gardner's motion to consider his premature appeal from the judgment and directed the court clerk to file Gardner's second notice of appeal in the record for this appeal.

## DISCUSSION

On appeal, Gardner challenges many of the family court's property characterizations (Discussion part B, *post*), the order requiring him to reimburse Bennett $25,000 for Gardner's alleged use of community funds to post bail (Discussion, part C, *post*), the award of $70,000 in sanctions under Family Code section 271 (Discussion, part D, *post*), and the award of spousal support arrears and interest under the support stipulation (Discussion, part E, *post*).  Before resolving these issues, we decide whether the court failed to issue an appropriate statement of decision.

### A. The Family Court Erred In Failing To Issue a Statement of Decision Explaining the Legal and Factual Bases for the Property Characterizations Gardner Challenges on Appeal

#### 1. *The law governing statements of decision*

Ordinarily, " '[u]nder the doctrine of implied findings, the reviewing court must infer, following a bench trial, that the trial court impliedly made every factual finding necessary to support its decision.' [Citation.]"  (See *Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981 (*Thompson*).)  "For the doctrine of implied findings to be disabled on appeal," a party must follow "both steps of the two-step procedure [set forth by Code of Civil Procedure]

7

section[s] 632 and 634 . . . ." (See *Thompson*, at pp. 979, fn. 2, 983.)

Code of Civil Procedure section 632 provides in pertinent part: "(a) In superior courts, upon the trial of a question of fact by the court, written findings of fact and conclusions of law shall not be required. The court shall issue a statement of decision explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial upon the request of any party appearing at the trial. The request must be made within 10 days after the court announces a tentative decision . . . . The request for a statement of decision shall specify those controverted issues as to which the party is requesting a statement of decision. After a party has requested the statement, any party may make proposals as to the content of the statement of decision. [¶] (b) The statement of decision shall be in writing, unless the parties appearing at trial agree otherwise . . . ." (Code Civ. Proc., § 632, subds. (a)–(b).)

As relevant here, Code of Civil Procedure section 634 provides: "When a statement of decision does not resolve a controverted issue, or if the statement is ambiguous and the record shows that the omission or ambiguity was brought to the attention of the trial court . . . prior to entry of judgment . . . , it shall not be inferred on appeal . . . that the trial court decided in favor of the prevailing party as to those facts or on that issue." (Code Civ. Proc., § 634.) This statute requires a party to identify "[t]he alleged omission or ambiguity . . . with sufficient particularity to allow the trial court to correct the defect. [Citation.] 'By filing specific objections to the court's statement of decision a party pinpoints alleged deficiencies in the statement and allows the court to focus on the facts or issues the

party contends were not resolved or whose resolution is ambiguous.' [Citation.]" (See *Ermoian v. Desert Hospital* (2007) 152 Cal.App.4th 475, 498 (*Ermoian*).)

California Rules of Court, rule 3.1590(d), (e), (f), and (g) implement Code of Civil Procedure sections 632 and 634. (See *Thompson*, *supra*, 6 Cal.App.5th at p. 982.) Rule 3.1590(f) provides, as a general rule, "If a party requests a statement of decision . . . , the court must, within 30 days of announcement or service of the tentative decision, prepare and serve a proposed statement of decision and a proposed judgment on all parties that appeared at the trial . . . ." (See Cal. Rules of Court, rule 3.1590(f).) Rule 3.1590(g) in turn provides: "Any party may, within 15 days after the proposed statement of decision and judgment have been served, serve and file objections to the proposed statement of decision or judgment." (*Id.*, rule 3.1590(g).)

### 2. Although Gardner timely requested a statement of decision and timely objected to the family court's proposed statement of decision, the court failed to issue an adequate statement of decision as to many of its property characterizations

The parties do not dispute that the family "court issued its tentative decision in writing via a Minute Order . . . . [that] was issued on March 13, 2024." In the March 13, 2024 minute order, the court made property characterization rulings but did not explain the court's rationale for those rulings. For instance, the family court simply found Bennett had "met her burden of proof" in showing that certain assets (e.g., Chase Bank account nos. xxx5239 and xxx0210) "were either acquired before marriage or are otherwise [Bennett's] separate property . . . ." The court clerk

9

served notice of entry of the March 13, 2024 minute order on the parties' counsel on the date the order was issued.

Gardner "served and filed a Request for Statement of Decision . . . on March 22, 2024," that is, within the 10-day deadline for doing so. (See Discussion, part A.1, *ante*.) Gardner sought a statement of decision on, inter alia, the rulings that we address in Discussion, parts B.1 to B.6, *post*. [5]

On May 10, 2024, the court issued two orders denying Gardner's request for a statement of decision on the ground that the court's March 13, 2024 minute order "explain[ed] the court's factual and legal determinations sufficiently to constitute the statement of decision." Neither order issued on May 10, 2024 indicates the court directed the court clerk or either party to serve one or both of the orders on the parties. Therefore, California Rules of Court, rule 3.1590(g)'s 15-day deadline for Gardner to object to the rulings included in the March 13, 2024 minute order was not triggered by the May 10, 2024 orders. (See

---

[5] Gardner arguably failed to request clearly a statement of decision for the family court's decision not to increase the community interest in Bennett's Chase Bank account no. xxx7946 by $5,500 to account for her intramarital transfer to Vanguard IRA account no. xxx9925. (See Discussion, part B.7, *post*.) Although Gardner asserted the $5,500 transfer undermined the court's conclusion that *the Vanguard IRA account* was separate property, he did not request a statement of decision explaining why the community interest *in Chase Bank account no. xxx7946* had not been increased by $5,500. We do not decide whether Gardner failed to describe sufficiently this issue in his request because any failure on the part of the court to articulate its rationale for not including an additional $5,500 in its valuation of the community's interest in Chase Bank account no. xxx7946 was harmless. (See Discussion, part B.7, *post*.)

10

Discussion, part A.1, *ante* [noting that rule 3.1590(g) provides a 15-day deadline that commences upon service of a proposed statement of decision and judgment].)

On May 28, 2024, Gardner filed and served a document that construed the March 13, 2024 minute order as a proposed statement of decision and levelled objections to that document. In particular, Gardner objected to the proposed statement of decision's failure to explain the legal and factual basis for each ruling we address in Discussion, parts B.1 to B.4 and B.6, *post*.[6] On June 3, 2024, the family court filed the judgment, which adopted the rulings provided in its March 13, 2024 minute order.

---

[6] With regard to the court's ruling the community had an interest of $15,420.39 in Gardner's USAA Federal Saving Bank account no. xxx937-4 (which ruling we address in our Discussion, part B.5, *post*), Gardner raised the following objection: "This finding is not supported by the evidence. This valuation directly contradicts the account statement that was stipulated to by [Bennett] and admitted into evidence during the trial." This objection did not "focus the [family] court on any particular omissions or ambiguities in the proposed statement of decision" as Code of Civil Procedure section 634 requires. (See *Ermoian*, *supra*, 152 Cal.App.4th at p. 499.) Instead of informing the court that Gardner believed it had failed to articulate sufficiently the legal and factual basis for its valuation of the community's interest in the USAA account at $15,420.39, Gardner claimed the ruling was erroneous. Accordingly, the doctrine of implied findings applies to the court's valuation of the community's interest in this account. (See *Thompson, supra*, 6 Cal.App.5th at p. 983 [noting that "strict adherence" to "both steps of the two-step procedure under section[s] 632 and 634" is required "[f]or the doctrine of implied findings to be disabled on appeal"].)

In light of the procedural history described above, we conclude Gardner timely requested and objected to the court's statement of decision. We also conclude the court failed to issue an adequate statement of decision. A " 'court's statement of decision is sufficient if it fairly discloses the court's determination as to the ultimate facts and material issues in the case.' [Citations.] . . . '[T]he term "ultimate fact" generally refers to a core fact, such as an essential element of a claim.' [Citation.] 'Ultimate facts are distinguished from evidentiary facts and from legal conclusions.' [Citation.]" (See *Thompson*, *supra*, 6 Cal.App.5th at p. 983.) As we noted above, the court's property characterizations are only legal conclusions. We thus have "no means of ascertaining the [family] court's reasoning [as to these rulings] or determining whether its findings on disputed factual issues support the judgment as a matter of law." (See *id.* at p. 982.)

Bennett argues Gardner was not entitled to a statement of decision because he "failed to timely submit a proposed statement of decision and written judgment." (Boldface & capitalization omitted.) In advancing this argument, she relies upon California Rules of Court, rule 3.1590(f), which states: "If a party requests a statement of decision . . . , the court must, within 30 days of announcement or service of the tentative decision, prepare and serve a proposed statement of decision and a proposed judgment on all parties that appeared at the trial, unless the court has ordered a party to prepare the statement. A party that has been ordered to prepare the statement must within 30 days after the announcement or service of the tentative decision, serve and submit to the court a proposed statement of decision and a proposed judgment. *If the proposed statement of decision and*

12

*judgment are not served and submitted within that time, any other party that appeared at the trial may* within 10 days thereafter: (1) prepare, serve, and submit to the court a proposed statement of decision and judgment or (2) *serve on all other parties and file a notice of motion for an order that a statement of decision be deemed waived.*" (Cal. Rules of Court, rule 3.1590(f), italics added.)

Bennett acknowledges that the "court did not order either party in this matter to prepare a statement of decision," and that the court did not prepare and serve a proposed judgment prior to the expiration of California Rules of Court, rule 3.1590(f)'s 30-day deadline for doing so. Bennett argues, without any supporting record citation, that at an unspecified point in time, she "requested that the court enter an order deeming the statement of decision waived." Further, she intimates the court's failure to issue that order was harmless because we may deem Gardner to have waived his right to a statement of decision by not serving Bennett with a proposed statement of decision and judgment within 10 days after the expiration of the court's 30-day deadline for serving a proposed statement of decision and judgment under rule 3.1590(f).

We are unpersuaded. California Rules of Court, rule 3.1590(f) authorizes a party to serve and submit a proposed statement of decision and judgment *or* move for an order "deem[ing]" the statement of decision "waived," either of which actions must occur "within 10 days" after the initial deadline to prepare and serve a proposed statement of decision and judgment elapses; that initial deadline is 30 days after the court announces or serves its tentative decision. (See Cal. Rules of Court, rule 3.1590(f).) Adopting Bennett's construction of rule 3.1590(f)

13

would put a party in the untenable position of filing a motion deeming the other party's right to a statement of decision to have been waived before the other party would have waived that right by failing to timely serve and submit a proposed statement of decision and judgment.  We reject Bennett's impractical construction of this rule.  (See *People v. Lofchie* (2014) 229 Cal.App.4th 240, 251 (*Lofchie*) [" ' "We must . . . avoid an interpretation [of a statute] that would lead to absurd consequences." ' "]; *Alan v. American Honda Motor Co., Inc.* (2007) 40 Cal.4th 894, 902 ["The ordinary principles of statutory construction govern our interpretation of the California Rules of Court."].)  Rather, we read rule 3.1590(f) as allowing a party to secure an order deeming another party to have waived the right to a statement of decision only if the court ordered the other party to serve and submit a proposed statement of decision and judgment but failed timely to do so.  Because the court did not order Gardner to serve and submit a proposed statement of decision, Gardner did not waive his right to a statement of decision by failing to comply with rule 3.1590(f)'s deadline for doing so.

We next turn to the appropriate remedies for the court's failure to issue an appropriate statement of decision.

**B.** **Remanding To Allow the Family Court To Issue the Required Statement of Decision Is the Proper Remedy as to Several of the Challenged Property Characterizations, Whereas Others Require a Different Disposition**

" 'Characterization . . . refers to the process of classifying property as separate, community, or quasi-community.' [Citation.]  It 'is an integral part of the division of property on

14

marital dissolution.' [Citation.]" (*In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 91 (*Ciprari*).) "Under Family Code section 2550, the court must divide the community estate of the parties equally." (*In re Marriage of Campi* (2013) 212 Cal.App.4th 1565, 1572, fn. omitted.) "The trial court's findings on the characterization and valuation of assets in a dissolution proceeding are factual determinations which are reviewed for substantial evidence." (*Ibid.*) " 'In a substantial evidence challenge to a judgment, the appellate court will "consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings]. [Citations.]" [Citation.] We may not reweigh the evidence and are bound by the trial court's credibility determinations. [Citations.] Moreover, findings of fact are liberally construed to support the judgment.' [Citation.]" (*Ciprari*, at p. 94.)

Although Code of Civil Procedure section 634 bars us from invoking the doctrine of implied findings to review the property characterizations for which the court was required to — but did not — prepare an adequate statement of decision (see Discussion, part A, *ante*), the proper appellate remedy for that error is not de novo review of the evidence concerning those rulings. "The function of [a] . . . Court of Appeal is not to supplant the trial court as the forum for consideration of the facts and assessing the credibility of witnesses or to substitute its discretion for that of the trial court." (See *Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (2004) 118 Cal.App.4th 1429, 1437.)

"Where a reviewing court determines that a trial court's failure to issue a properly requested statement of decision was

15

prejudicial," e.g., if reversal is " ' "require[d] . . . in order for the appellate court to effectively perform a review of the material issues[,]" ' " "the usual remedy is to remand with instructions to issue a proper statement of decision." (See *Alafi v. Cohen* (2024) 106 Cal.App.5th 46, 62, 71–72 (*Alafi*).) "To the extent the trial judge has no immediate independent recollection of the matter he must take whatever steps are available to refresh his recollection to perform his duty" to prepare a statement of decision setting forth the legal and factual bases for the court's rulings. (See *Karlsen v. Superior Court* (2006) 139 Cal.App.4th 1526, 1531.)

Gardner asks us to direct the court to issue a modified judgment in his favor on the disputed property characterizations. To obtain that appellate relief, Gardner must demonstrate, as a matter of law, he is entitled to the modified judgment he seeks. (See *Regalia v. The Nethercutt Collection* (2009) 172 Cal.App.4th 361, 370 (*Regalia*) [indicating that an " 'appellate court can reverse with directions to enter [a] judgment or order' " if it is persuaded " 'the record indicates what the proper judgment or order should have been' "]; *Association for Los Angeles Deputy Sheriffs*, *supra*, 94 Cal.App.5th at p. 792 [holding that a reviewing court does not make arguments for the parties].) As we explain below, Gardner fails to discharge that burden. (See Discussion, parts B.1–B.7, *post*.)

As for the court's award of Chase Bank account nos. xxx0210 and xxx5239, Schwab account nos. xxx1094, xxx6584, and xxx4324, Schwab IRA account no. xxx1574, and a Rolex watch to Bennett as her separate property, we reverse those rulings and instruct the court to reconsider the characterization of those assets on remand in light of the issues we address in Discussion, parts B.1–B.3, *post*.

16

We further conclude there is a possibility that the following rulings could be supported by substantial evidence: (1) the award of the wedding ring to Bennett without offset or equalization, and (2) the award of Fidelity IRA account no. xxx2240 to Bennett as her separate property. (See Discussion, parts B.4 & B.6, *post*.) Remand, however, is still necessary because the court failed to provide us with its rationale for those determinations.

Because Gardner's objection regarding USAA Federal Saving Bank account no. 937-4 was inadequate (see fn. 6, *ante*), the family court did not err in declining to issue a statement of decision articulating the legal and factual basis for its ruling the community had an interest of $15,420.39 in that account. We thus review that ruling under the doctrine of implied findings (*ibid.*), and affirm the court's valuation of the community's interest in the account because substantial evidence supports it (see Discussion, part B.5, *post*).

Lastly, assuming arguendo the court failed to articulate sufficiently its rationale for declining to add $5,500 to the community's interest in Bennett's Chase Bank account no. xxx7946, that error was harmless. (See Discussion, part B.7, *post* [explaining that the community's interest in the $5,500 intramarital transfer from Chase Bank account no. xxx7946 to an IRA account will be accounted for in a Qualified Domestic Relations Order (QDRO)].) Consequently, we affirm the court's valuation of the community interest in Chase Bank account no. xxx7946. (See *Alafi*, *supra*, 106 Cal.App.5th at pp. 63–64 [noting that "the failure to issue a requested statement of decision is not reversible per se, but instead is subject to harmless error analysis"].)

17

### 1. The court erred in awarding Chase Bank account nos. xxx5239 and xxx0210 to Bennett as her separate property

The court awarded to Bennett as her separate property her "S-Corp, inclusive of Chase Bank Account No. xxx5239 and Chase Bank Account No. xxx0210." The court did not articulate its reasoning for this ruling. We conclude the court erred in failing to determine whether some portion of the S-Corporation's profits contained within these accounts should be apportioned to the community.

According to Bennett's testimony at trial, prior to her marriage to Gardner, she opened Chase Bank account nos. xxx0210 (a checking account) and xxx5239 (a savings account), and her initial deposits into account no. xxx5239 consisted of an inheritance from her late first husband totaling an amount greater than $50,000 but lower than $100,000. Bennett testified she thereafter deposited into those two accounts the payments she earned as a freelance writer through her S-Corporation titled "Andrea Bennett, Inc.," which business she claimed to have incorporated in 2011. Bennett further testified she earned income from this business both before and during her marriage to Gardner. Neither side directs us to any evidence showing the balances of Chase Bank account nos. xxx0210 and xxx5239 on the date of Bennett's marriage to Gardner.

Bennett also testified that prior to her marriage to Gardner, Bennett saved $195,000 in Chase Bank account no. xxx5239 (the savings account), which she asserted were separate property funds "inclusive of money [she] inherited from [her] first marriage and money earned from [her] S-Corp prior to [her] marriage" to Gardner. She admitted at trial she did not

18

have any documentary proof supporting her assertion she had saved $195,000 prior to marrying Gardner. Bennett stated that on June 30, 2014, she used the $195,000 in premarital savings from her Chase Bank account no. xxx5239 to open Schwab account no. xxx1094. (See Discussion, part B.2, *post* [discussing the family court's characterization of Schwab account no. xxx1094].)

On appeal, Gardner argues, "The profits from [Bennett's] business during marriage" deposited into Chase Bank account nos. xxx0210 and xxx5239 "are community property." (Boldface & some capitalization omitted.) Gardner claims the funds Bennett deposited into these accounts are "community property earnings during marriage," and that she "commingl[ed]" those funds "with her claimed separate property savings before marriage." Further, according to Gardner, "the evidence established that during the marriage, account #0210 dropped to $507.98 [citation], and account #5239 dropped to $10.95," whereas "[a]s of October 1, 2019, shortly after the date of separation, account #0210 had a balance of $95,997.60 and account #5239 had a balance of $37,091.89." Gardner thus maintains he "is entitled to one half of the balances in the[se two a]ccounts as of the date of separation" because the funds therein consisted of "income from [Bennett's] personal services as a freelance writer during the marriage" that had been commingled with separate property funds, the latter of which "had been exhausted during the marriage."

Bennett acknowledges that "any . . . monies in [these two] account[s]" deposited after the initial pre-marriage deposits totaling "between $50,000.00 and $100,000.00" were "earned from [her] separate property business[,] specifically, from freelance

writing payments received . . . ." Bennett, however, intimates there was no community interest in the two accounts because Bennett's "opinion was [that] the value of the business was [the] same at trial as at date of [the] marriage." The portion of the reporter's transcript cited by Bennett contains the following colloquy:

"Q. . . . Is your opinion of the value of Andrea Bennett, Inc., today the same as when you were married, your date of marriage February 2013?

"A. I don't know the amount that is in the account now versus the amount that was there on the date of my marriage. The value of the business is likely the same, but the amount of money in the accounts is likely different.

"Q. In your opinion, why is the value of the business the same from 2013 to today's date?

"A. Because that's a business that I've maintained for nearly 25 years."

As noted above, each party takes a maximalist approach, with Gardner asserting the earnings from Bennett's freelance business during the marriage are entirely community property, and Bennett claiming they are entirely separate property.

The court declared the business, inclusive of Chase Bank account nos. xxx0210 and xxx5239, to be Bennett's separate property. Because the court failed to issue a statement of decision explaining its rationale for this award to Bennett, we cannot review its ruling under the doctrine of implied findings. (See Discussion, part A, *ante*.)

Furthermore, we lack sufficient information to determine in the first instance whether, and if so, to what extent, the

20

community has an interest in the two accounts. (See, e.g., *In re Marriage of Dekker* (1993) 17 Cal.App.4th 842, 851 [indicating that if "a [spouse] owns a separate property business and devotes [the spouse's] efforts to the enterprise," then "an apportionment of the profits" between the separate and community estates is appropriate]; *Beam v. Bank of America* (1971) 6 Cal.3d 12, 18 [holding that a court " 'may select [whichever method of allocation of profits] will achieve substantial justice between the parties' "].) Although Gardner acknowledges the family court "must 'determine what portion of the profits . . . arises from the use of [the spouse's] capital and what part arises from the activity and personal ability of the spouse[,]' " he offers no analysis or citation to authority to support his position that *none* of Bennett's business income during marriage is her separate property. Similarly, Bennett offers no citation to authority supporting her claim that because she opined the value of the business was the same at trial as it was at the date of marriage, the community has no interest in the earnings from her freelance writing business.[7]

We thus leave this property characterization and valuation issue to the court to resolve on remand. The court is directed to articulate the legal and factual basis for its ruling as to Chase Bank account nos. xxx5239 and xxx0210. Nothing in our opinion bars the court from requesting further argument and evidence

---

[7] Because the court did not explain the legal and factual basis for its ruling that the two accounts in question are Bennett's separate property, we cannot infer the court credited her testimony as to the value of the business. (See Discussion, part A, *ante*.)

21

from the parties regarding whether and to what extent the community has an interest in these two accounts.

### 2. The court erred in awarding Schwab account nos. xxx1094, xxx6584, and xxx4324 and Schwab IRA account no. xxx1574 to Bennett as her separate property

The court awarded Bennett, as her separate property, Schwab account nos. xxx1094, xxx6584, and xxx4324, along with Schwab IRA account no. xxx1574.

The record contains evidence tending to show the source of the funds for all four accounts was the initial $195,000 deposit from Chase Bank account no. xxx5239 to Schwab account no. xxx1094 on June 30, 2014. (See Discussion, part B.1, *ante* [discussing evidence relating to the initial deposit into Schwab account no. xxx1094].) Bennett testified that in August 2014, she opened Schwab account no. xxx6584 with a $100,000 deposit from Schwab account no. xxx1094.[8] Gardner acknowledges in his opening brief that Bennett opened Schwab account no. xxx4324 in 2016; Bennett testified at trial the initial source of the funds for Schwab account no. xxx4324 was the $195,000 deposit into account no. xxx1094. Similarly, Gardner acknowledges Bennett opened Schwab IRA account no. xxx1574 in 2017, which Bennett testified she opened with funds originating from the initial $195,000 deposit.

---

[8] The court admitted into evidence trial exhibit No. 18, which is a Schwab account statement showing account no. xxx1094 was the source of the August 2014 deposit of $100,000 into account no. xxx6584.

Because the court did not issue a statement of decision explaining why the court awarded all four Schwab accounts to Bennett as her separate property, we cannot infer the court credited this evidence connecting these four accounts to the $195,000 deposit from Chase Bank account no. xxx5239 in June 2014.  (See Discussion, part A, *ante*.)  Additionally, if the court did rely upon Bennett's testimony connecting the Schwab accounts to Chase Bank account no. xxx5239 when the court awarded these Schwab accounts to Bennett as her separate property, we cannot presume the court determined whether, and to what extent, the freelance writing payments earned during marriage that Bennett deposited into Chase Bank account no. xxx5239 should be allocated to the community.  (See Discussion, part B.1, *ante*.)  That determination as to the community's potential interest in the freelance payments could ultimately affect the value of any community interest in the four Schwab accounts.  Accordingly, we reverse the award of the four Schwab accounts to Bennett as her separate property, and direct the court to determine upon remand whether, and, to what extent, the community has an interest in the Schwab accounts.

Gardner advocates the proper appellate remedy is to direct the family court to "modify the [j]udgment to reflect" that Schwab account nos. xxx1094, xxx6584, and xxx4324 and Schwab IRA account no. xxx1574 "and any funds they contain are community property."  He invokes Family Code section 760's "basic presumption that, except as otherwise provided by statute, all property acquired by a married person during marriage, while domiciled in California, is community property."  (See *Ciprari*, *supra*, 32 Cal.App.5th at p. 91.)  According to Gardner, to overcome this presumption, "[Bennett] was required to trace her

23

separate property before marriage (inheritance and saved earnings), as well as the withdrawal or transfer during the marriage to the Schwab Accounts and Schwab IRA." He contends Bennett "failed to produce any such evidence and her testimony alone does not meet this exacting burden" because her testimony was not corroborated by any "records or expert testimony . . . ."**9** As we explain below, Gardner has not shown the heightened record keeping requirement to rebut the community property presumption applies to Chase Bank account no. xxx5239 — which Bennett claimed was the source of the $195,000 deposit into Schwab account no. xxx1094 — or to any of the four Schwab accounts at issue.

"The need for specific records and documents to trace funds" to rebut "the general presumption that property acquired during marriage is community property" "arises when there is a *commingled* account," that is, the "commingling of separate and

_____

**9** Gardner also argues, "[Bennett's] testimony was admittedly unreliable due to the difficulty of recalling how she earned, spent, and saved money over a decade ago." Insofar as Gardner maintains no rational factfinder could credit Bennett's testimony regarding the sources of funding for the four Schwab accounts, Gardner has forfeited that contention by failing to support it with analysis and citation to legal authority. (See *In re Jordan R.* (2012) 205 Cal.App.4th 111, 136 [holding that a factfinder's credibility determinations may be set aside only if it is "physically impossible for the [witness's] statements to be true, or their falsity [is] apparent without resorting to inferences or deductions"]; *County of Los Angeles v. Niblett* (2025) 116 Cal.App.5th 454, 466 (*Niblett*) [" ' "[W]e may disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt." ' "].)

community funds . . . ." (See *In re Marriage of Ficke* (2013) 217 Cal.App.4th 10, 25 (*Ficke*).) "A burden of recordkeeping logically arises out of the very act of commingling funds during marriage so the general community property presumption is not thwarted." (See *ibid.*) " *'[I]f the separate property and community property interests have been commingled in such a manner that the respective contributions cannot be traced and identified*, the entire commingled fund will be deemed community property pursuant to the general community property presumption of [Family Code] section 760.' [Citations.]" (See *Ciprari*, *supra*, 32 Cal.App.5th at pp. 91–92 & fn. 5, italics added.)

" '*Generally*, either of two tracing methods may be used to characterize disputed property interests [and thereby rebut the general community property presumption] — *"direct tracing"* or *"family living expense tracing"* ' [citation]." (See *Ciprari*, *supra*, 32 Cal.App.5th at pp. 95–96.) The first method "requires (a) documentary proof that sufficient separate property funds were available in the account at the time of purchase and (b) proof that the spouse making the purchase intended to use separate, rather than community, funds." (See *ibid.*) The second method requires a "showing that . . . *all* community property funds were exhausted at the time the purchase or payment at issue was made [such that] separate property funds necessarily must have been used." (See *id.* at p. 96.)

Conversely, a court may rely solely on the "testimony of a single witness, even a party in a divorce case," that separate property funds in an account were not commingled with community funds, such that heightened record keeping requirements are inapplicable. (See *Ficke*, *supra*, 217 Cal.App.4th at p. 27.)

In arguing that Bennett could not rely upon her testimony to trace the initial deposit of $195,000 in Schwab account no. xxx1094 to Chase Bank account no. xxx5239, Gardner appears to treat Chase Bank account no. xxx5239 as if it were a commingled account, the contents of which are presumptively community property unless Bennett complies with heightened record keeping requirements. Indeed, in connection with Chase Bank account nos. xxx5239 and xxx0210, he claims all "the profits from [Bennett's] business during marriage are community property" (boldface & some capitalization omitted), and because Bennett supposedly "commingl[ed] . . . her community property earnings during marriage with her claimed separate property savings before marriage," the full balances of both Chase Bank accounts belong to the community.

In our Discussion, part B.1, *ante*, we have rejected Gardner's argument as to the S-Corporation's two Chase Bank accounts. Further, even if the community does have an interest in the two Chase Bank accounts, this case still would not involve the paradigm of commingling in which a spouse deposits intramarital salary and other employment compensation into an account containing separate property funds. (See, e.g., *Ciprari, supra*, 32 Cal.App.5th at pp. 89–91, 101 [describing such a scenario and noting the husband in that case offered a "detailed tracing analysis" in an attempt to rebut the general community property presumption].) At no point on appeal does Gardner address whether heightened record keeping tracing requirements apply when the alleged source of separate property funds is an account that may contain an unapportioned community interest in intramarital business profits (i.e., Chase Bank account no. xxx5239).

Accordingly, Gardner has not shown he is entitled, as a matter of law, to a judgment awarding to the community the entirety of Schwab IRA account no. xxx1574 and Schwab account nos. xxx1094, xxx6584, and xxx4324 pursuant to the general community property presumption.  We express no opinion on how the court should characterize these accounts.  We simply conclude Gardner has not met his burden of demonstrating he is entitled to an order directing the court to characterize these accounts as community property.  (See Discussion, part B, *ante* [noting at the outset of this part that Gardner bears the burden of showing his entitlement to judgment in his favor as a matter of law].)

In sum, we reverse the award of Schwab account nos. xxx1094, xxx6584, and xxx4324 and Schwab IRA account no. xxx1574 to Bennett as her separate property, and remand the matter to the court for further proceedings to ascertain the characterization of these accounts and issue a statement of decision articulating the factual and legal bases for its characterizations of these accounts.

### 3.  *The court erred in awarding the Rolex watch to Bennett as separate property*

The family court ruled, "With respect to all . . . jewelry [other than the parties' wedding rings], the court finds all [such] other jewelry to be the separate property of the spouse in possession of such jewelry and awards all [such] other jewelry to the spouse presently in possession of said jewelry without offset o[r] equalization."

At trial, the court heard evidence that Bennett purchased a Rolex watch on August 19, 2013, that is, approximately six months into her marriage to Gardner.  (Factual & Procedural

27

Background, *ante* [noting the parties were married in Feb. 2013].) Bennett testified she traded in jewelry from her first marriage to cover $1,945.80 of the purchase price.  Bennett also provided testimony indicating that she paid the remaining $7,567 of the purchase price out of one or both of her bank accounts associated with her S-Corporation, that is Chase Bank account nos. xxx0210 and/or xxx5239.  (See Discussion, part B.1, *ante* [identifying those two accounts].)  Additionally, it can be inferred from Bennett's testimony that her income during the first six months of her marriage would not have been sufficient for her to purchase the watch, thereby suggesting she used at least some premarital funds for the acquisition.

Gardner asks us to "modify the [j]udgment to reflect a community property interest of $7,567 in the Rolex watch."  He contends, "[Bennett] did not offer any documentary evidence establishing the date of the alleged transfer or tracing the funds to a separate property source."  Gardner further contends, "[E]ven if [Bennett] had established the funds came from" one or both of the Chase Bank accounts associated with her S-Corporation, those accounts were "commingled" such that the Rolex watch acquired with the funds should be deemed community property.

As we explained in our Discussion, part B.1, *ante*, the court must determine in the first instance on remand whether to allocate to the community a portion of the intramarital freelance writing payments deposited into the two Chase Bank accounts. Because Bennett testified she used $7,567 from one or both of those accounts to acquire the Rolex watch, on remand, the lower court must determine whether to credit that testimony and to what extent, if any, the community has an interest in the watch.

28

Gardner fails to show Bennett's testimony would not be a legally sufficient basis upon which the court could find the Chase Bank accounts were the source of funds used to purchase the Rolex. The statutory community property presumption required Bennett to produce specific records tracing the watch to separate property only if the funds used to purchase that asset came from a commingled account. (See Discussion, part B.2, *ante*.) Gardner has not shown that the funds in the Chase Bank accounts were subject to that heightened record keeping tracing requirement. (See *ibid.*) Therefore, he fails to demonstrate, as a matter of law, that he is entitled to a judgment awarding the community an interest of $7,567 in the Rolex watch. We express no opinion on who would prevail upon remand regarding whether the community has an interest in the watch.

We thus reverse the family court's finding that the Rolex watch is entirely Bennett's separate property, and direct the court to reconsider that determination after assessing whether Bennett's earnings from her S-Corporation during marriage should be apportioned in whole or in part to the community.

### 4. *Remand is necessary as to the court's award of the wedding ring to Bennett as her separate property*

Family Code section 852, subdivision (a) provides: "A transmutation of real or personal property is not valid unless made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected." (Fam. Code, § 852, subd. (a).) Subdivision (c) of the statute states in relevant part: "This section does not apply to a gift between the spouses of . . . jewelry . . . that is used solely or principally by the spouse to

29

whom the gift is made and that is not substantial in value taking into account the circumstances of the marriage." (*Id.*, subd. (c).)

The court found that Gardner and Bennett "exchanged wedding rings with one another after marriage," the two "gave and received the aforementioned wedding rings as gifts," and, because the "wedding rings are gifts within the meaning of Family Code §852(c)[,] . . . [Bennett's] wedding ring and [Gardner's] wedding ring [were] awarded to the party [then] in possession of said ring without offset or equalization." The court did not find that Gardner made the written declaration as specified in Family Code section 852, subdivision (a).

On appeal, Gardner does not dispute the court's finding that both wedding rings were gifts. Instead, he correctly points out the court did not make "any express finding as to whether the ring was or was not a 'gift of substantial value' " such that there was a valid transmutation under Family Code section 852, subdivision (c), "nor [did the court] cite to any evidence supporting such a finding." Because the court failed to explain its rationale for awarding the wedding ring to Bennett without offset or equalization, we cannot apply the doctrine of implied findings to the order awarding the wedding ring to Bennett. (See Discussion, part A, *ante*.)

Gardner argues we should "modify the [j]udgment to reflect a reimbursement to [Gardner] for his separate property contribution of $17,300 to the purchase of [Bennett's] wedding ring."

On appeal, Gardner claims he testified that "he contributed approximately $17,300 *in separate property funds* to the purchase of [Bennett's] wedding ring." (Italics added.) In the excerpts of his testimony he cites, however, Gardner did not identify the

source of those purported separate property funds. Additionally, under the substantial evidence standard, the court did not have to credit Gardner's testimony. (See *Ciprari*, *supra*, 32 Cal.App.5th at p. 94 [" 'In a substantial evidence challenge to a judgment, . . . . [w]e may not reweigh the evidence and are bound by the trial court's credibility determinations.' "].)

Next, on appeal, Gardner contends Bennett testified, "[T]he circumstances of the marriage were such that the Rolex watch she purchased shortly after marriage for $7,000 was substantial in value because she would not have earned enough money to cover it during the first six months of her marriage."[10] He apparently contends this testimony conclusively establishes "[Gardner's] contribution of $17,300 [towards the wedding ring] shortly after the marriage would also be substantial in value." Because Gardner does not sufficiently analyze the couple's financial circumstances at the time of the purchase of Bennett's wedding ring, he fails to demonstrate affirmatively the absence of substantial evidence of transmutation under Family Code section 852, subdivision (c).

Accordingly, Gardner has not shown his entitlement, as a matter of law, to reimbursement of $17,300 for Bennett's wedding ring.[11] We direct the family court to prepare a revised statement

_____

[10] Although Gardner intimates in the quotation accompanying this footnote that the Rolex watch cost only $7,000, we explained in our Discussion, part B.3, *ante*, Bennett's testimony indicates she acquired the watch by paying $7,567 in cash and trading in $1,945.80 in jewelry.

[11] We note that at the close of trial, the court remarked, "As to the rings, you have got 17 — [ap]proximately 17- to $20,000 in contribution from [Gardner] toward the wedding ring.

of decision setting forth its factual and legal findings regarding the wedding ring.

> **5.** **We affirm the family court's determination that the community had an interest of $15,420.39 in Gardner's USAA Federal Saving Bank account no. xxx937-4**

The parties agree their date of separation was August 31, 2019. "The earnings and accumulations of a spouse . . . after the date of separation of the spouses[ ] are the separate property of the spouse." (See Fam. Code, § 771, subd. (a).)

The family court found the community had an interest of $15,420.39 in Gardner's USAA Federal Saving Bank account no. xxx937-4. Gardner argues, "This amount came from [Gardner's] Schedule of Assets and Debts, filed December 9, 2019. [Citation.] However, during trial, the court admitted into evidence an account statement for the period ending September 5, 2019 (shortly after separation) reflecting a balance of $5,771.67." According to Gardner, because "[t]he September 5 statement is the best documentary proxy for the date-of-separation value," "the judgment should be modified to reflect a community interest of $5,771.67 in account #937-4."

Gardner does not dispute — and thus tacitly agrees with — Bennett's assertions that (1) the USAA Federal Saving Bank statement for the account as of September 5, 2019 was only "a partial [account] statement" and (2) Gardner offered no testimony explaining "the nearly $10,000.00 difference between" the

_____

That seems to be in line with — it is not outside the ballpark for their apparent income when it comes to that kind of item . . . ."

$15,420.39 balance shown on his December 9, 2019 schedule of assets and debts and the $5,771.67 balance shown on the September 5, 2019 partial account statement.[12] These undisputed facts constitute substantial evidence that the September 5, 2019 partial account statement was not reliable evidence of the balance of the account as of August 31, 2019. Put differently, a reasonable factfinder could infer that Gardner may have transferred certain funds out of that account after August 31, 2019 and redeposited them into the account prior to December 9, 2019. (See *Ciprari*, *supra*, 32 Cal.App.5th at p. 94 [holding that under the substantial evidence standard, all reasonable inferences are drawn in favor of the judgment and the reviewing court does not reweigh the evidence].)

We thus reject Gardner's assertion the court had to believe the $5,771.67 balance in the September 5, 2019 partial account statement. Rather, applying the doctrine of implied findings (see fn. 6, *ante*), we conclude the court rejected Gardner's reliance on the September 5, 2019 partial account statement and that substantial evidence supported the court's decision not to rely on that partial statement. We affirm the court's ruling that the community has an interest of $15,420.39 in USAA Federal Saving Bank account no. xxx937-4.

---

[12] (See *Association for Los Angeles Deputy Sheriffs*, *supra*, 94 Cal.App.5th at pp. 773–774 [holding that the appellants "tacitly concede[d]" a point raised in the respondents' brief by "failing to dispute it in their reply"].)

### 6. *Remand is necessary as to the court's award of Fidelity IRA account no. xxx2240 to Bennett as her separate property*

The court awarded Fidelity IRA account no. xxx2240 to Bennett as her separate property. In her final declaration of disclosure dated October 20, 2023 that was admitted into evidence as trial exhibit No. 2, Bennett stated she opened this account in 2018. Gardner acknowledges in his opening brief Bennett testified at trial that "the Fidelity IRA was a rollover account from a job she had prior to marriage, and that she made no deposits during the marriage." The court's failure to provide an adequate statement of decision prevents us from inferring it relied on Bennett's testimony.

Gardner maintains we should direct the court to modify the judgment to designate the Fidelity IRA account as community property because Bennett's testimony is insufficient, as a matter of law, to overcome Family Code section 760's community property presumption. As we explained in our Discussion part B.2, *ante*, "The need for specific record tracing arises when there is a *commingled* account." (See *Ficke, supra*, 217 Cal.App.4th at p. 25.) Gardner does not direct us to any evidence showing this Fidelity IRA account, or the retirement account from which the funds deposited into the Fidelity IRA account originated, contained commingled funds. We thus cannot conclude on this record that Family Code section 760 required the court to characterize the Fidelity IRA account as community property. We thus direct the court on remand to provide an adequate statement of decision on the characterization of this Fidelity IRA account.

34

### 7. *Any failure on the part of the court to articulate sufficiently its rationale for valuing the community interest in Chase Bank account no. xxx7946 at $21,698 was harmless*

The court ruled the community has an interest of $21,698.00 in Chase Bank account no. xxx7946. Gardner complains the court "failed to credit the community interest in [this account] by $5,500 for [Bennett's] intra-marital transfer to her Vanguard IRA [account]."

In response, Bennett claims, inter alia, she had transferred the $5,500 to Vanguard IRA account no. xxx9925. She correctly points out the court had ordered the community interest in this IRA account to be divided pursuant to a QDRO. Bennett maintains, "Said division will result in a division of any community interest in this account, including any deposits or transfers made during the marriage." Put differently, according to Bennett, "upon completion of the [QDRO] for Vanguard IRA [account no.] xxx9925, [Gardner] will be fully compensated [as to] his requested $5,500.00 reimbursement . . . ."

In his reply, Gardner does not rebut Bennett's contentions (1) she deposited the $5,500 into Vanguard IRA account no. xxx9925, and (2) he will be fully compensated for that transfer upon the completion of the QDRO.

Because we deem the parties to have agreed the court did not erroneously exclude $5,500 from the community estate because the Vanguard IRA will be subject to a QDRO (see fn. 12, *ante*), any failure by the court to set forth sufficiently the legal and factual basis for not increasing the community's interest in Chase Bank account no. xxx7946 by $5,500 was harmless. (See Discussion, part B, *ante* [noting at the outset of this part the

failure to issue a statement of decision can constitute harmless error].)  We thus affirm this ruling.[13]

## C.     The Family Court Erred In Ordering Gardner To Reimburse Bennett $25,000 for Bail

On appeal, Gardner argues the family court erred in ordering him to reimburse Bennett $25,000 for his posting bail. He contends Bennett did not satisfy her burden of showing he used community funds to post bail.[14]  Indeed, he asserts, "[N]o testimony was offered [showing] that such [bail] payment was made from community funds . . . ."

The court found "[Gardner] posted bail in the amount of $50,000.00 to obtain pre-trial release from jail following his arrest" and "[Gardner] was unable to trace the payment of this

---

[13] Gardner argues for the first time in his reply brief that if we do not increase the community interest in Chase Bank account no. xxx7946 by $5,500, we should modify the judgment to "reflect that a QDRO must occur and properly account for [Bennett's] undisputed intramarital transfer of $5,500" to the Vanguard IRA account.  As we noted earlier, the judgment already calls for the preparation of a QDRO for Vanguard IRA account no. xxx9925.  In any event, Gardner forfeits this request by belatedly raising it and failing to support it with analysis or citation to authority.  (See *Niblett*, *supra*, 116 Cal.App.5th at p. 475.)

[14] Gardner further argues the doctrine of implied findings does not apply to the reimbursement order because the family court failed to address adequately that issue in its statement of decision.  We do not reach that question because even if the doctrine of implied findings governed our review of that order, we would still conclude the court erred in ordering Gardner to reimburse Bennett for the bail money.

36

bail money to a separate property source." The court thus placed the burden on Gardner to show he paid the bail with his separate property funds. This was error. Bennett bore the burden of demonstrating Gardner misappropriated or misused community assets for his personal benefit. (See *In re Marriage of Feldner* (1995) 40 Cal.App.4th 617, 625 [holding that "the aggrieved spouse" seeking "reimbursement to the community for losses caused by separate conduct of one spouse" must make an "affirmative showing" the spouse who incurred the losses engaged in "intentional conduct not benefiting the community"].) She did not satisfy that burden.

In her appellate brief, Bennett does not direct us to any evidence Gardner used community property funds to post bail.[15] Instead, she cites her testimony that she "believe[d]" the amount of bail paid was $50,000, but she did not specify the source of the payment. She also cites Gardner's testimony that (1) he paid only $25,000 for bail, (2) he made the payment from certain unspecified separate property investments, but (3) he could not otherwise "remember where [he] got the money."

Bennett's failure to identify any evidence tracing Gardner's bail payment to a community source is fatal to her claim for reimbursement. We thus reverse the order requiring Gardner to reimburse Bennett $25,000 for the bail payment and direct the

_____

[15] " ' " 'Although it is the appellant's task to show error, there is a corresponding obligation on the part of the respondent to aid the appellate court in sustaining the judgment.' " ' " (*Association for Los Angeles Deputy Sheriffs*, *supra*, 94 Cal.App.5th at p. 787, fn. 19.) We are not "obligate[d] . . . to scour the record" to search for evidence supporting the judgment. (See *id.* at p. 802.)

37

court to issue a modified judgment omitting that order.  (See *Regalia*, *supra*, 172 Cal.App.4th at p. 370 [" 'If the record indicates what the proper judgment . . . should have been, the appellate court can reverse with directions to enter that judgment . . . .' "].)

**D.** **Although We Affirm the Court's Decision To Award a Sanction Under Family Code Section 271, We Reverse the Amount of the Sanction and, to the Extent Bennett Used Community Funds To Pay Her Civil Attorneys, the Court Must Adjust Any Equalization Payment Accordingly**

Family Code section 271, subdivision (a) provides: "Notwithstanding any other provision of this code, the court may base an award of attorney's fees and costs on the extent to which any conduct of each party or attorney furthers or frustrates the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between the parties and attorneys.  An award of attorney's fees and costs pursuant to this section is in the nature of a sanction.  In making an award pursuant to this section, the court shall take into consideration all evidence concerning the parties' incomes, assets, and liabilities.  The court shall not impose a sanction pursuant to this section that imposes an unreasonable financial burden on the party against whom the sanction is imposed.  In order to obtain an award under this section, the party requesting an award of attorney's fees and costs is not required to demonstrate any financial need for the award."  (Fam. Code, § 271, subd. (a).)

The family court awarded Bennett $70,000 in sanctions pursuant to Family Code section 271, which the court found were

38

the attorney fees and costs Bennett incurred "with her civil counsel, Freedman & Taitelman," in defending against Gardner's civil action. The court identified three independent bases for its decision, each of which "merit[ed] sanctions": (1) the civil action Gardner brought against Bennett "frustrated the public policy of the state to promote settlement of litigation[ and was] frivolous"; (2) Gardner's motion to set aside the support and Astro stipulations likewise "frustrated the public policy of the state to promote settlement of litigation[ and was] frivolous"; and (3) Gardner's failure to respond to a settlement offer from Bennett from January 14, 2020 to May 2023 "frustrated the public policy of the state to promote settlement of litigation . . . ."[16]

We conclude Gardner fails to demonstrate the court erred in ruling Bennett was entitled to sanctions under Family Code section 271 based on its finding the civil action and motion to set aside the stipulations were frivolous. (Discussion, part D.2, *post*.)[17] We, however, hold the court erred in setting the sanction at $70,000 in contravention of the lower amount her civil attorneys billed her. (Discussion, part D.3, *post*.) Finally, on remand the court must adjust any equalization payment if Bennett used community funds to pay her civil attorneys. (Discussion, part D.4, *post*.) Before discussing these issues, we

[16] We note Gardner acknowledges in his opening brief the family court determined the "filing [of] the Civil Complaint and the Motion to Set Aside" "frustrated the public policy of the state to promote settlement of litigation" and were " 'frivolous.' "

[17] We thus do not address whether Gardner's delay in responding to Bennett's settlement offer was sanctionable under Family Code section 271.

39

set forth the standard governing our review of the sanctions award.

### *1.    The applicable standard of review*

"We review an award of attorney fees and costs under [Family Code] section 271 for abuse of discretion.  [Citation.] . . . We review any factual findings made in connection with the award under the substantial evidence standard."  (*In re Marriage of Fong* (2011) 193 Cal.App.4th 278, 282, fn. 1, 291 (*Fong*).)  An aspect of the substantial evidence standard is " 'the doctrine of implied findings[,]' " which provides that " 'the reviewing court must infer . . . that the trial court impliedly made every factual finding necessary to support its decision.' [Citation.]"  (See *Thompson, supra*, 6 Cal.App.5th at p. 981.)  Furthermore, " 'regardless of the applicable standard of review[,]' " " ' " ' "it is the appellant's responsibility to affirmatively demonstrate error" ' " by " ' "supply[ing] the reviewing court with some cogent argument supported by legal analysis and citation to the record." ' [Citation.]" [Citations.]' . . . [Citation.]"  (See *Niblett, supra*, 116 Cal.App.5th at p. 463.)

Gardner argues the doctrine of implied findings does not apply here because the court did not issue an adequate statement of decision.

Code of Civil Procedure section 632 requires the issuance of a timely requested statement of decision for the "trial of issues that could have been raised in the pleadings," and not for an award of "attorney fees and costs under [Family Code] section 271 . . . ."  (See *Fong, supra*, 193 Cal.App.4th at pp. 278, 294, 296–297.)  Thus, even as to sanctions imposed under Family Code section 271 after holding "an extensive evidentiary hearing," no statement of decision is required to support the

40

sanctions award. (See *Fong*, at pp. 294, 296–297.) *Fong* reasoned Code of Civil Procedure section 632's "references to 'trial' suggest that a statement of decision is required only in the event of a trial, *as that term is commonly understood.*" (See *Fong*, at p. 294, italics added.)

Although the family court heard evidence supporting Bennett's request for sanctions under Family Code section 271 at trial, Gardner does not argue cogently that adjudication of Bennett's sanctions request was a "trial of a question of fact" for purposes of Code of Civil Procedure section 632. (See Code Civ. Proc., § 632; see also *Fong*, *supra*, 193 Cal.App.4th at p. 294 ["Code of Civil Procedure section 632 requires a statement of decision, if one is timely requested, only 'upon *the trial* of a question of fact by the court.' "].) It is also not apparent to us the applicability of Code of Civil Procedure section 632 hinges on the mere happenstance the court did not elect to consider Bennett's request for sanctions in a separate hearing.

In sum, we conclude Gardner fails to discharge his appellate burden to establish the family court erred in declining to issue a statement of decision regarding its award of attorney fees and costs under Family Code section 271. It follows the doctrine of implied findings applies to our review of that award.

### 2. *Gardner fails to show the court erred in concluding his civil action and motion to set aside the stipulations merited sanctions under Family Code section 271*

As we noted in our Factual and Procedural Background, *ante*, Gardner moved to set aside the Astro and support stipulations and filed a civil action against Bennett alleging causes of action for intentional infliction of emotional distress,

intentional interference with a prospective economic advantage, tortious interference with contractual relations, breach of fiduciary duty, and extortion.  To establish the court erred in finding Gardner's civil action and motion to set aside were frivolous, Gardner must affirmatively demonstrate there is no substantial evidence demonstrating that the civil action and motion were " 'so devoid of merit that no reasonable person would have pursued [them].' [Citation.]"  (See *Featherstone v. Martinez* (2022) 86 Cal.App.5th 775, 785, fn. 8 [discussing the type of frivolous conduct that may give rise to sanctions under Fam. Code, § 271]; see also Discussion, part D.1, *ante* [explaining that Gardner must affirmatively demonstrate the absence of substantial evidence supporting the family court's findings].) Gardner fails to make that showing.

First, the court found it had previously addressed many of the allegations underlying Gardner's civil action in denying his prior request for a domestic violence restraining order.  It is undisputed the court denied Gardner's request for the restraining order on April 1, 2021, long before (1) he filed the civil action in February 2022, and (2) the 2024 trial of those claims in the family law action.  (See Factual & Procedural Background, *ante* [discussing the procedural history of the case].)  Gardner does not contest the court's finding that his civil claims were based in part on allegations supporting his unsuccessful request for a restraining order, nor does he explain why that finding does not support the court's ruling his civil action was frivolous.

Second, it is undisputed Gardner's civil claim for tortious interference with contractual relations was based in part on his allegation that "[Bennett] interfered with [Gardner's] then-existing employment with Morrison Foerster" by "fabricating that

42

[Gardner] burglarized [Bennett's] home."  There is no dispute that at trial, Gardner's former supervisor at Morrison Foerster testified the firm terminated him on January 28, 2020 because of a poor annual performance evaluation.  This evidence tends to prove Gardner should have known the tortious interference claim lacked merit after he saw that annual performance evaluation.[18]

Third, the family court found the perjury and fraud allegations Gardner offered in support of his motion to set aside the Astro and support stipulations were "clearly" time-barred. Gardner does not challenge this finding, which lends further support to the court's finding his motion to set aside the stipulations was frivolous.

Lastly, the only evidence Gardner cites in support of his claim that the civil action and motion to set aside the stipulations were not frivolous is his former family law attorney's "testimony regarding [Gardner's] claim of duress and civil extortion."

_____

[18]  Gardner vaguely testified at trial the annual performance evaluation (exhibit No. 24) "was not officially given to [him]."  Nevertheless, Gardner answered in the affirmative when the court asked whether Gardner "recognize[d] that [document] as [Gardner's] performance evaluation," which the court reasonably could have construed as an admission Gardner had seen the exhibit at some point before the court tried his tortious interference with contractual relations claim.  Furthermore, attached to his December 2021 declaration accompanying his motion to set aside the Astro and support stipulations is a memorandum from Morrison Foerster stating the firm terminated Gardner "as a result" of his annual evaluation.  Thus, before he filed the civil action in February 2022, Gardner was apparently aware of Morrison Foerster's position that he had been terminated for the reasons stated in the annual performance evaluation.

43

Although Gardner acknowledges on appeal his former counsel admitted "no one made an explicit threat" to elicit Gardner's consent to the stipulations, he claims his former attorney testified that "the risk of prosecution directly impacted [Gardner's] livelihood and was the basis on which he agreed to terms that heavily favored [Bennett]." Gardner contends his attorney testified that in her "opinion as a certified Family Law Specialist, [Gardner] gave up more spousal support rights than he would have had to relinquish 'on his worst day in court,' and did so solely 'in exchange' for [Bennett's] acknowledgement of his ownership of Astro." Gardner asserts Bennett later " 'completely reneged on what had been agreed upon' " by telling law enforcement Astro was not Gardner's separate property and testifying at the preliminary hearing in the burglary case that Astro was a family pet.

Gardner's former attorney's testimony arguably would have been relevant to his allegations of perjury and fraud had the claims not been time barred. Yet, Gardner provides no legal analysis or citation to authority supporting the proposition that evidence (1) Gardner signed the stipulations to avoid criminal liability and (2) Bennett later purportedly frustrated that purpose give rise to colorable claims for duress and civil extortion. He thus fails to rebut the presumption of correctness accorded to the court's finding that those claims were frivolous. (See *Cruz v. Tapestry, Inc.* (2025) 113 Cal.App.5th 943, 954 (*Cruz*) ["To 'rebut[ ] the presumption of correctness accorded to the trial court's decision,' the appellant must ' " ' "supply[ ] the

44

reviewing court with some cogent argument supported by legal analysis and citation to the record." ' " ' "].)**19**

In sum, Gardner has not shown the court erred in ruling his civil action and motion to set aside were frivolous or in awarding sanctions under Family Code section 271 for such frivolous litigation.

### 3. *The family court erred in awarding Bennett $70,000 in attorney fees and costs*

We conclude that no reasonable factfinder could find Bennett incurred more than $54,108.37 in attorney fees and costs in the civil action. As noted earlier, the court found Bennett "incurred approximately $70,000.00 in attorney fees and costs with her civil counsel, Freedman & Taitelman." Bennett's appellate briefing indicates the sole basis for this finding was her testimony, found at page 1257 of volume 5 of the reporter's transcript, that she paid "around $70,000" to her civil attorneys. Bennett so testified immediately after she made the following remark when asked to identify trial exhibit No. 12: "These were statements of the amounts that I paid civil attorneys." Trial exhibit No. 12, in turn, consists of invoices from Freedman and Taitelman, LLP for legal work performed from May 2022 to November 2022.

---

**19** For that same reason, we reject as underdeveloped Gardner's suggestion, not supported by analysis, that his claim of intentional infliction of emotional distress was not frivolous. Additionally, Gardner makes no attempt to show the court erred in finding his causes of action for intentional interference with a prospective economic advantage and breach of fiduciary duty were frivolous.

Gardner correctly points out the total attorney fees and costs billed in trial exhibit No. 12 is only $54,108.37. Bennett did not testify the invoices in trial exhibit No. 12 correspond only to *some* of the attorney fees and costs she incurred in the civil action; she testified these documents reflected "*the* amounts" she paid her civil counsel. (Italics added.) Under these circumstances, the court could not reasonably rely on Bennett's testimony approximating the attorney fees and costs incurred in the civil action to have been $70,000. The only reasonable inference the court could have drawn is that Bennett incurred no more than $54,108.37 in attorney fees and costs in the civil action. (See *In re Carlos J.* (2018) 22 Cal.App.5th 1, 6 [" ' "Substantial evidence" is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value. [Citation.] "Substantial evidence . . . is not synonymous with 'any' evidence." ' "].)

We, however, reject Gardner's argument that Freedman and Taitelman billed Bennett for "unnecessary or duplicative work." Gardner supports this position with the following general statement: "For example, the bills reflect certain work which [Bennett's] family law attorneys would have otherwise performed, such as issuing subpoenas to [Gardner's] former law firm and efforts to obtain court records and transcripts which she ultimately offered into evidence in the family law trial." Gardner does not provide any analysis of the law firm's bills to support his conclusory argument. We therefore decline to address his contention any further. (See *Cruz, supra*, 113 Cal.App.5th at pp. 953–954.)

Further, Bennett fails to salvage the court's $70,000 sanction award. In her appellate brief, Bennett argues she

46

testified, "[T]he amount that she incurred to resist or otherwise address [Gardner's] sanctionable conduct . . . was ' . . . in excess of $100,000.' " In fact, she testified the latter figure was an "estimate" that included the $70,000 she claims to have incurred in the civil action. It is not apparent to us that a rational factfinder could set an attorney fee and costs award based on such a vague overall "estimate" of fees and costs that includes a $70,000 figure that itself contradicts the lesser amount her attorneys billed her.[20]

Gardner contends, "[T]he amount of the award was not tethered to actual attorney fees and costs incurred" because if "the civil court [had not] sustained [Bennett's] demurrer to [Gardner's] complaint for lack of jurisdiction, . . . . the matter would have proceeded in civil court entirely outside the family law proceeding. In that scenario, any work performed on that case would have been necessary regardless of the family law

_____

[20] At oral argument, Bennett's counsel asserted for the first time the bills he submitted to Bennett for attorney fees and costs incurred in the family court action may appear somewhere in the voluminous record. Counsel also suggested for the first time the award of sanctions need not be tied to attorney fees or costs his client incurred or anticipated incurring in connection with the civil or family law matters. We reject these arguments because Bennett belatedly raised them and it is not our job to search the record for counsel's purported bills. (See *BFGC Architects Planners, Inc. v. Forcum/Mackey Construction, Inc.* (2004) 119 Cal.App.4th 848, 854 ["We will not consider an issue not mentioned in the briefs and raised for the first time at oral argument."]; Cal. Rules of Court, rule 8.204(a)(1)(C) [requiring the parties to "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears"].)

matter. Moreover, [Gardner's] willingness to stipulate to his civil claims being heard in family court[ ] likely reduced the fees that would have ultimately been incurred in the civil case." Gardner's proffered scenario has no apparent relevance here. The fact remains that Bennett had to defend against Gardner's frivolous civil claims in two fora. (See Factual & Procedural Background, *ante*; Discussion, part D.2, *ante*.) Thus, the attorney fees and costs Bennett incurred in defending the civil action are attributable to Gardner's sanctionable conduct.[21]

### 4. *If Bennett used community funds to pay her civil attorney fees and costs, the court must adjust the equalization payment on remand accordingly*

At trial, Bennett testified she withdrew a total of $50,000 from Schwab account no. xxx6584 to pay fees she owed to her civil counsel. We explained in our Discussion part B.2, *ante*, that the family court erred in awarding the entirety of Schwab account no. xxx6584 to Bennett as her separate property. Accordingly, on remand, the court must determine to what extent, if any, Bennett used community property to pay the

---

[21] In his reply brief, Gardner argues for the first time the court should not have awarded sanctions under Family Code section 271 because the court did not "find that [Gardner] filed the civil action in a forum where it clearly did not belong[ or] that the action was a disguised family law enforcement proceeding . . . ." He also contends for the first time in his reply that the court made remarks at trial suggesting it believed Gardner "had a basis to bring [his civil] claims." Gardner forfeited these arguments by belatedly raising them in his reply. (See *Niblett*, *supra*, 116 Cal.App.5th at p. 475.)

$54,108.37 in attorney fees and costs she was billed for the civil action, and if so, adjust any equalization payment to her accordingly.[22]

## E. Gardner Fails To Demonstrate the Court Erred In Awarding Bennett $26,582.83 Pursuant to the Parties' Support Stipulation

### 1. *The support stipulation and the court's award of spousal support arrears*

On January 8, 2020, the parties and their respective counsel executed and filed the support stipulation. The support stipulation, which was signed by the family court on the date it was filed, states it is a court order.

The support stipulation contains several handwritten provisions including, as pertinent here:

"1. On the express condition [Gardner] maintains his licence [*sic*] to practice law and continues to earn an annual gross income of $190,000.00, the following stipulation is made:

"(a) Commencing January 1, 2020, [Gardner] shall pay to [Bennett], as [and] for spousal support, the amount of $4,300.00 per month. Said support shall be payable one-half on the first of the month, and one-half on the fifteenth of the month through

---

[22] Gardner's argument that "the award imposes an unreasonable financial burden" is premature at this time. (Boldface & capitalization omitted.) The family court may on remand find it necessary to adjust Gardner's equalization payment to Bennett if Bennett used community funds to pay her civil attorney fees and costs.

49

June 30, 2023, which represents one-half the length of the marriage. Said support is non-modifiable as to the amount and duration and shall only terminate on the death of either party, the marriage of [Bennett], or June 30, 2023, whichever shall first occur.

"(b) [Gardner] waives his right to receive spousal support from [Bennett].

"(c) On July 1, 2023, the Court's jurisdiction to award spousal support to either party shall terminate.

. . .

"3. The conditional language set forth in paragraph 1 . . . above shall not apply if [Gardner] retires or quits his job without being forced to do so (i.e., employer states, quit or you will be terminated)."[23]

Based on the support stipulation, the court awarded Bennett spousal support arrears of $26,582.83, which is comprised of five and a half months of spousal support totaling $23,650 and interest at the legal rate of 10 percent totaling $2,932.83. The court reasoned: (1) Gardner "maintained his license to practice law throughout the pendency of this action"; (2) Gardner "was employed and earning in excess of $190,000.00 annually in January 2020 from his then employer with Morrison Foerster;" and (3) Gardner "was employed and earning in excess of $190,000.00 annually from February 2023 through June 2023 from a combination of sources, including his current employer

---

[23] We note neither side claims Gardner's termination from Morrison Foerster in January 2020 triggered paragraph 3 of the support stipulation.

50

Reyes Coca-Cola Bottling, his rental income from 5829 Pirate Ship Drive, North Las Vegas, Nevada . . . , and monthly income received from the United States Military." The court also found Gardner paid only $2,150 in spousal support in January 2020 (instead of $4,300) and failed to make the five monthly payments of $4,300 owed from February 2023 to June 2023.

## 2. *Gardner's argument on appeal and the applicable standard of review*

On appeal, Gardner argues, "[T]he undisputed evidence established that [Gardner] did not reach the annual gross income threshold in any given year during the term of the [s]upport [s]tipulation and therefore was not obligated to pay spousal support." He contends, "[T]he record is clear that [Gardner] lost his job at Morrison and Foerster on January 28, 2020 and was unemployed through much of the remainder of the year. [Citation.] Accordingly, he did not earn an annual gross income of $190,000 and his spousal support obligation did not accrue. As to February through June 2023, [Gardner's] W-2 for 2023 established his gross income as $154,114.20. In addition, he received approximately $3,408 from military disability pay ($284/month) and a maximum of $1,536 from rental income ($128/month). Thus, his annual gross income for 2023 did not exceed $160,000."

Gardner acknowledges Bennett argued below that "if [Gardner's] monthly income were extrapolated over 12 months, [Gardner] met the threshold for January 2020 and February through June 2023." As a factual matter, Gardner does not dispute that if his monthly income for January 2020, and February through June 2023, respectively, were extrapolated over 12 months, his annual gross income during those

51

timeframes would meet or exceed $190,000. Instead, he argues, "The phrase 'continues to earn an annual gross income of $190,000' is clear and explicit and refers to annual gross income, not monthly gross income, and not monthly gross income extrapolated over a calendar year. Had the parties intended that to be the case, they could have used words to that effect. The trial court erred in interpreting the *annual* income requirement as a *monthly* income requirement and the spousal support order should be reversed."

Because Gardner's claim of error rests solely on his interpretation of the text of the support stipulation, it presents a question of law we review de novo. (See *Enmark v. KF Community Care, LLC* (2024) 105 Cal.App.5th 463, 471 ["[W]e review de novo any questions of law — such as the interpretation of a written instrument [citation] — as well as the application of that law to undisputed facts . . . ."].) We resolve that issue below. Further, because Gardner's claim presents a purely legal issue, we need not determine whether the family court's statement of decision sufficiently described the legal and factual basis for its award of spousal support arrears to Bennett. (See *Davenport v. Unemployment Ins. Appeals Bd.* (1994) 24 Cal.App.4th 1695, 1696, 1700 [holding that because the appellant's claim of error presented only "a question of law" subject to the appellate court's "independent[ ] review," "the absence of a statement of decision [was] not prejudicial to [the appellant]"].)

### 3. *We reject Gardner's interpretation of the support stipulation*

Gardner argues the support stipulation did not obligate him to pay the second half of the monthly spousal support for January 2020 because his termination from Morrison Foerster on

January 28, 2020 precluded him from earning a total annual gross income of $190,000 that year.  Likewise, he claims he did not owe Bennett spousal support in February, March, April, May, and June 2023 because he ultimately earned no more than $160,000 during that calendar year.  His argument hinges on what he deems to be "the plain meaning" of the phrase "continues to earn an annual gross income of $190,000.00" in the support stipulation, and the absence of any text allowing his monthly income to be extrapolated to determine whether he satisfies that condition in any given month.

A principal purpose of spousal support is maintaining the recipient's standard of living.  (See, e.g., Fam. Code, § 4320, subd. (d) [providing that in ordering spousal support, a court shall consider, inter alia, "[t]he needs of each party based on the standard of living established during the marriage"].)  To achieve that objective, the support stipulation provides that if the income and law license conditions were satisfied, then Gardner had to make monthly payments of $4,300 — $2,150 due on the 1st of the month and $2,150 on the 15th of the month.

Gardner's literal interpretation of the phrase "continues to earn an annual gross income of $190,000.00" would subvert that purpose by suspending Bennett's right to monthly spousal support unless and until Gardner has, in fact, earned a gross income of $190,000 or more in a given year, at which point he would apparently owe support arrears to Bennett.  Additionally, Gardner's spousal support obligation terminated no later than June 30, 2023, and yet the parties would not know whether he did in fact earn a gross income of at least $190,000 during calendar year 2023 until months later or perhaps the end of the year.  In the interim, Bennett alone would bear the burden of

53

maintaining her standard of living each month, even if Gardner's projected gross annual earnings met or exceeded the $190,000 threshold. Accordingly, we reject Gardner's proffered construction.[24]

In sum, Gardner fails to demonstrate the family court erred in annualizing his gross monthly income to determine whether he owed spousal support under the stipulation in any given month. We thus affirm the court's award of spousal support arrears for one-half of the payment owed for January 2020 and the full payments owed for February 2023 to June 2023, along with the interest thereon totaling $2,932.83.[25] (Discussion, part E.1, *ante* [observing the court awarded spousal support arrears and interest].)

---

[24] (See *Lofchie, supra,* 229 Cal.App.4th at p. 251 [" '[T]he "plain meaning" rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose . . . .' [Citation.] ' "We must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." ' "]; *Concerned Citizens Coalition of Stockton v. City of Stockton* (2005) 128 Cal.App.4th 70, 77 [" '[T]he same rules of interpretation will apply in ascertaining the meaning of a court's order as in ascertaining the meaning of any other writing.' "].)

[25] Although Gardner claims Morrison Foerster terminated him on January 28, 2020, he does not argue the family court should have reduced the second half of the $4,300 monthly spousal support obligation to account, on a pro rata basis, for the fact that he was not employed for the full month of January 2020.

# DISPOSITION

We reverse the following parts of the family court's judgment: (1) the award of Chase Bank account nos. xxx0210 and xxx5239 to respondent Andrea Bennett as her separate property; (2) the award of Schwab account nos. xxx1094, xxx6584, and xxx4324, and Schwab IRA account no. xxx1574 to Bennett as her separate property; (3) the award of the Rolex watch to Bennett as her separate property; (4) the award of the wedding ring to Bennett as her separate property with no offset or equalization; (5) the award of Fidelity IRA account no. xxx2240 to Bennett as her separate property; (6) the order requiring appellant Reid Gardner to reimburse Bennett $25,000 for bail; and (7) the award of $70,000 in sanctions to Bennett under Family Code section 271.

We remand the matter with instructions to: (1) determine whether, and if so, to what extent, the community has an interest in Chase Bank account nos. xxx0210 and xxx5239, Schwab account nos. xxx1094, xxx6584, and xxx4324, Schwab IRA account no. xxx1574, and the Rolex watch; (2) prepare a statement of decision explaining the legal and factual basis for the court's (a) award of the wedding ring to Bennett as her separate property without equalization or offset, and (b) award of Fidelity IRA account no. xxx2240 to Bennett as her separate property; (3) issue a modified judgment omitting the provision requiring Gardner to reimburse Bennett $25,000 for bail; (4) determine the amount of attorney fees and costs Bennett paid to her civil attorneys, which is awardable as a sanction under Family Code section 271 and shall not exceed $54,108.37; (5) adjust the equalization payment if the court finds Bennett used community funds to pay the attorney fees and costs

awarded under Family Code section 271; and (6) conduct further proceedings consistent with this opinion.

The judgment is otherwise affirmed.  The parties shall bear their own costs on appeal.

<u>NOT TO BE PUBLISHED.</u>


BENDIX, J.


We concur:



ROTHSCHILD, P. J.



M. KIM, J.